UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

CHRISTINA NOGA,                                      Civ. No. 07-847-AC

                Plaintiff,

        v.                                          OPINION AND
                                            ORDER

COSTCO WHOLESALE CORPORATION,
a private Washington corporation licensed to
do business in Oregon,

                Defendant.

_____

ACOSTA, Magistrate Judge:

       Plaintiff Christine Noga ("Noga") asserts the following claims against Defendant Costco

Wholesale Corporation ("Costco"): gender discrimination under Title VII, 42 U.S.C. § 2000e-2

and -3, and ORS 659A.030; age discrimination under the Age Discrimination in Employment Act

("ADEA"), 29 U.S.C. § 623, and ORS 659A.030; retaliation in violation of Title VII, the ADEA,

and ORS 659A.030, and intentional infliction of emotional distress ("IIED").  Costco moves for summary judgment on all claims.  For the reasons that follow, Costco's motion is granted.[1]

*Factual Background*

Noga's employment relationship with Costco began in May 2000, when she began work as a cake decorator in the bakery department at Costco's Bend Warehouse.  (Noga Deposition ("Depo.") 86-87.)  The Bend Warehouse Manager was Richard Graber ("Graber").  (Graber Declaration ("Decl.") ¶ 1.)  Noga's immediate supervisor was Bend Bakery Manager, Lance Cabe ("Cabe").  (Cabe Depo. 11.)  Noga received copies of Costco's Employee Agreement, (Defendant's Exhibit ("Def.'s Ex.") 1 at 42-50), Anti-Harassment Policy, (Def.'s Ex. 1 at 52), and acknowledged receipt and understanding of each document.  (Def.'s Ex. 1 at 39-41, 51.)  Noga read and signed a copy of Costco's Employee Agreement, prior to and during her employment with Costco.  (Plaintiff's ("Pl.'s") Exs. 2-5.)  "Noga understood she had an obligation to report any harassment, discrimination, or other inappropriate behavior as soon as possible, and that Costco's 'open door policy' allowed her to make a report to" a member of Costco management or human resources.  (Def.'s Concise Statement of Material Facts ("CSMF") ¶ 2.)

Noga's employment at Costco was subject to a ninety-day probationary period, "during which [she could] be terminated at any time, for any reason."  (Def.'s Ex. 1 at 51.)  In her first Probationary Review, dated August 23, 2000, Cabe noted that Noga needed to improve "working with others."  (Def.'s Ex. 1 at 53.)  Noga received two more probationary reviews and a pay raise, based on her prior work experience.  (Pl.'s Exs. 8, 10.)  One of these reviews, prepared by Cabe on

---

[1] All parties have consented to jurisdiction by magistrate judge in accordance with 28 U.S.C. § 636(c)(1).

June 22, 2000, said that Noga showed "excellent skill and ability."  (Pl.'s Ex. 8.; Cabe Depo. 49:6-24.)

      Noga's first non-probationary performance review was prepared by Cabe on September 21, 2001. (Def.'s Ex. 1 at 54-55.)  In relevant part, the review stated that Noga's "communications with other employees could improve." (Def.'s Ex. 1 at 55.)  Her second performance review, prepared by Tammy Cornett on May 30, 2002, stated that Noga "would benefit by establishing more positive relationships with coworkers by remaining professional.  Tone can be disrupt[ive] at times and taken out of context." (Def.'s Ex. 1 at 57.)  In her third performance review, prepared by Cabe on May 22, 2003, Noga received praise for her "speed in decorating," and her helpfulness in training new decorators.  Cabe wrote, "Simply put:  Christina is a great decorator." (Def.'s Ex. 1 at 61.)  However, the review also stated:  "Christina could improve on her delivery sometimes.  Realize that by not putting others on the defensive [she] will improve communication," and "the only improvement that Christine could make with our members is to 'take 5' a little more often." (Def.'s Ex. 1 at 61.)

      On February 20, 2003, Noga requested transfer to Costco's Wilsonville facility.  (Def.'s Ex. 1 at 59.)  The transfer took place in July 2003.  (Noga Depo. 57:2-4.)  At that time, Wilsonville's Warehouse Manager was Robert Curtis ("Curtis").  (Curtis Decl. ¶ 1-2.)  Noga's immediate supervisor was Wilsonville's Bakery Manager, Robert Harvey ("Harvey").  (Harvey Decl. ¶ 2.)  Noga's only performance review at Wilsonville was prepared and signed by Harvey on May 20, 2004. (Pl.'s Ex. 16.)  The evaluation included positive comments about Noga's performance, such as:  "Christina commits to her job and demonstrates Costco's values well," "Expressing ideas comes naturally to Christina.  She listens well and follows directions given," and "Christina's ability to

work independently and to follow through with projects goes without question." (Def.'s Ex. 1 at 64.) At the bottom of the evaluation is a handwritten note that appears to be written by Curtis. It says, "Christina, Great job! Thanks, Bob." (Def.'s Ex. 1 at 65.)

However, Harvey, as had Cabe, noted Noga's interpersonal short-comings, as he wrote, "Christina's customer service is good. She just needs to be a little bit more courteous and respectful of the members' time." (Def.'s Ex. 1 at 64.) Harvey also suggested that Noga "keep smiling for our members and have patience in helping out coworkers," "take time to teach the coworkers correctly and give them encouragement," and, Noga herself suggested that she should "be a better teacher for coworkers." (Pl.'s Ex. 16 at 3.) In her deposition, Noga admitted "she had trouble with her coworkers and that her coworkers expressed that she was too direct and bossy." (Def.'s CSMF ¶ 7; Noga Depo. ¶¶ 91, 93.) There is no evidence in the record that Cabe and Harvey ever discussed Noga's interpersonal skills, or any other aspect of her performance at any time.[2]

While at Wilsonville, Noga had problems with a coworker, Roberta Vermilyer ("Vermilyer"), who Noga felt was not doing her job. (Noga Depo. 91:14-25.) Noga complained to Harvey that Vermilyer was allowed to leave early even though she had not finished her work. (Noga Depo. 92:18-24.) Harvey urged Noga to put it behind her; "[Harvey] would say, 'What happened in yesterday needs to stay in yesterday.'" (Noga Depo. 92:25-93:2.) Harvey also criticized Noga's decorating technique and "frequently counseled Noga for not following Costco's cake decorating manual." (Def.'s CSMF ¶ 8.) Noga never complained to management or human

---

[2] Bend, located in Central Oregon, is approximately 160 miles southeast of Wilsonville, which is located in the Willamette Valley immediately south of Portland. Cabe reported to Graber in Bend, and Harvey reported to Curtis in Wilsonville. There is no evidence that Cabe and Harvey shared duties or coordinated their supervisory responsibilities.

resources, either formally or informally, about Harvey's criticism of her or about any unfair treatment regarding her problems with Vermilyer. (Noga Depo. 97:14-22, 102:16-25.)

Harvey referred to himself as "Boss Man" at work. (Noga Decl. ¶ 5.) Noga claims that Harvey's use of this nickname was "offensive and demeaning" and that other employees complained to her about it. *Id.* Harvey testified that when he used the nickname he was merely "having fun at work." (Harvey Depo. 31:4-6.) He also stated that no one complained to him about its use and that Costco management never discussed it with him. (Harvey Depo. 31:7-12.) Noga presented no evidence from co-workers to support her assertion or refute Harvey's testimony.

In early 2005, Noga requested transfer to the Bend warehouse, but the request was denied, (Noga Depo. 65:22-25, 66:18-23), and Graber was the one who denied it, (Graber Decl. ¶ 5). A few months later, Noga voluntarily resigned her position at the Wilsonville warehouse; her last day was April 12, 2005. (Noga Depo. 65: 8-9; 76: 22-25.) (Harvey Decl. ¶ 7.) At the time of her resignation, Noga had already secured a position at Williams Bakery in Eugene, Oregon. (Noga Depo. 74:13-15.) One month later, in May 2005, Noga applied for rehire at Costco's Bend warehouse. (Noga Depo. 76.) After submitting her application, Noga spoke with Cabe in Bend about being rehired by Costco. At the time of her application, there were no cake decorator positions open in the bakery department. (Cabe Decl. ¶ 3.) However, Cabe "thought Ms. Noga might be able to work in a cleanup position in the bakery, and that eventually a position as a cake decorator might open up for her." (Cabe Decl. ¶ 3.) Noga expressed interest in that position and Cabe sent her out to get a urinalysis, a standard test for new and rehired employees and usually one ordered for an employee who has been hired or rehired. (Noga Depo. at 80:18-25.) (Cabe Decl. ¶ 4.)

In response to Noga's reapplication, the Bend Costco requested Noga's personnel file from

Wilsonville.  Curtis received this request and decided to call Graber, who was on vacation at the time, to let him know.  (Curtis Depo. 36:23-37:3.)  According to Curtis, he told Graber that Noga had difficulties getting along with coworkers and "following directions in regards to company guidelines on the decorating of cakes."  (Curtis Depo. 38:2-10.)  Graber, who "in the hiring process has final decision-making authority," recalled that Curtis "wanted to let [him] know that Noga had become rather disruptive in the bakery at Wilsonville."  (Graber Depo 19:21-24; 24:3-5.)  Graber testified that he did not ask Curtis for additional details and the two did not discuss anything futher about Noga.  (Graber Depo. 23:5-10.)  In particular, Graber's declaration stated:  "I am sure that Mr. Curtis did not mention that Ms. Noga had ever made any complaints of age or sex discrimination at the Wilsonville warehouse."  (Graber Decl. ¶ 7.)  Curtis stated in his declaration that he was not aware of any complaints by Noga based on age or sex discrimination and that "[w]hen [he] spoke with Mr. Graber in May 2005, [they] did not discuss any complaints of sex or age discrimination by Mr. Noga."  (Curtis Decl. ¶ 5.)

Graber stated that, at the time he received the phone call from Curtis, and before Curtis told him anything about Noga, he already knew he was not interested in rehiring Noga.  (Graber Depo. 24:23-25:4.)  Graber testified that he based this knowledge on three things:  an incident involving Noga and a member of the Les Schwab family who came in to pick up a cake (the "Les Schwab incident"); Curtis's comments during the phone call about Noga; and his general impression that Noga had difficulty in interpersonal relationships. (Graber Depo. 30:12-22; 43:12-20.)  In fact, Graber stated that he had considered Noga a "marginal performer" based on his experience with her at Bend, in particular the Les Schwab incident.  (Graber Decl. ¶ 8.)  Noga subsequently received a letter from Costco informing her that she was not being rehired.  (Noga Depo. 81:15-17.)

*Legal Standard*

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c) (2008). Summary judgment is not proper if material factual issues exist for trial. *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir. 1995).

The moving party has the burden of establishing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party shows the absence of a genuine issue of material fact, the nonmoving party must go beyond the pleadings and identify facts which show a genuine issue for trial. *Id*. at 324. A nonmoving party cannot defeat summary judgment by relying on the allegations in the complaint, or with unsupported conjecture or conclusory statements. *Hernandez v. Spacelabs Medical, Inc.*, 343 F.3d 1107, 1112 (9th Cir. 2003). Thus, summary judgment should be entered against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

The court must view the evidence in the light most favorable to the nonmoving party. *Bell v. Cameron Meadows Land Co.*, 669 F.2d 1278, 1284 (9th Cir. 1982). All reasonable doubt as to the existence of a genuine issue of fact should be resolved against the moving party. *Hector v. Wiens*, 533 F.2d 429, 432 (9th Cir. 1976). Where different ultimate inferences may be drawn, summary judgment is inappropriate. *Sankovich v. Life Ins. Co. of North America*, 638 F.2d 136, 140 (9th Cir. 1981).

However, deference to the nonmoving party has limits. The nonmoving party must set forth

"specific facts showing a *genuine* issue for trial." Fed. R. Civ. P. 56(e) (2008) (emphasis added).

The "mere existence of a scintilla of evidence in support of the plaintiff's position [is] insufficient."

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).  Therefore, where "the record taken as

a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine

issue for trial."  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)

(internal quotation marks omitted).

*Discussion*

1.    Discrepancies between Noga's deposition and declaration.

Costco argues that discrepancies between Noga's declaration and her earlier deposition

testimony are an attempt to create genuine issues of material fact and to survive summary judgment.

The court must determine, as a threshold matter, whether Noga's declaration contradicts her

deposition and, if so, which portions are appropriately considered for purposes of this motion.

The Supreme Court has recognized the "virtual unanimity" of circuit courts that "a party

cannot create a genuine issue of fact sufficient to survive summary judgment simply by contradicting

his or her own previous sworn statement (by, say, filing a later affidavit that flatly contradicts that

party's earlier sworn deposition) without explaining the contradiction or attempting to resolve the

disparity."  *Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 806 (1999).  In the Ninth Circuit,

the general rule is that

> a party cannot create an issue of fact by an affidavit contradicting his prior deposition
> testimony.  'If a party who has been examined at length on deposition could raise an
> issue of fact simply by submitting an affidavit contradicting his own prior testimony,
> this would greatly diminish the utility of summary judgment as a procedure for
> screening out sham issues of fact.'

*Kennedy v. Allied Mut. Ins. Co.*, 952 F.2d 262, 266 (9th Cir. 1991) (internal citations omitted)

(quoting *Foster v. Arcata Associates*, 772 F.2d 1453, 1462 (9th Cir. 1985), *cert. denied*, 475 U.S. 1048 (1986)).  This rule does not extend to cases "in which a contradictory affidavit is introduced to explain portions of earlier deposition testimony.  Rather, [the rule is] concerned with 'sham' testimony that flatly contradicts earlier testimony in an attempt to 'create' an issue of fact and avoid summary judgment."  *Kennedy*, 952 F.2d at 267.  Therefore, the district court must determine whether the contradictory testimony was given in an honest effort to clarify, or was an intentional alteration, designed to create a genuine issue of material fact.

The manner in which courts have treated corrections to depositions, a related issue, sheds light on the proper treatment of the sham affidavit.  Federal Rule of Civil Procedure 30(e) permits corrections to deposition testimony within thirty days of "being notified by the officer that the transcripts or recording is available," and where changes are justified by a signed statement "reciting such changes and the reasons given by the deponent for making them."  FED. R. CIV. P. 30(e) (2008).  In *Hambleton Bros. Lumber Co. v. Balkin Enters.*, 397 F.3d 1217 (9th Cir. 2005), the plaintiff submitted deposition corrections pursuant to this rule, but did not submit the required statement of reasons.  The court noted examples where the "deposition corrections are clearly altered to allege facts sufficient to connect [a defendant] where none before existed."  *Id.* at 1226 n.6.  The court gave the following examples of the plaintiff's answers and "corrected" answers.  Where the plaintiff's original answer read "Personally, I guess he, he didn't breach it," the plaintiff's corrected answer read "I don't know the law but if Mr. Ballinger is responsible for Balkin's actions, then if Balkin breached the agreement, Mr. Ballinger breached the agreement."  Where the original answer read "I don't know," the corrected answer read "Mr. Ballinger represented to me in 1996 or 1997 that Balkin still owned the Fruitland property.  He acted as if he was still involved with Balkin."

OPINION AND ORDER                    9                    {KPR}

Finally, where the original answer again read "I don't know," the corrected answer read, "Ballinger

in the dissolution of Balkin distributed assets of Balkin, the Fruitland property, that should not have

been distributed, and he made me believe, in the 1996/1997 telephone conversation, that Balkin was

still in existence and still owned the Fruitland property, which was untrue." *Id*. The corrected

answers were clearly in conflict with the answers originally given at the deposition, especially as

to those questions to which the plaintiff had answered "I don't know."

    In response to these proffered "corrections" and in the absence of an explanation for these

corrections, the court wrote:

> A statement of reasons explaining corrections is an important component of errata
> submitted pursuant to FRCP 30(e), because the statement permits an assessment
> concerning whether the alterations have a legitimate purpose.  The magistrate judge
> was troubled by the deposition corrections' seemingly tactical nature . . . .  The
> absence of any stated reasons for the changes supports the magistrate judge's
> concern that the 'corrections' were not corrections at all, but rather purposeful
> rewrites tailored to manufacture an issue of material fact regarding Ballinger and to
> avoid a summary judgment ruling in his favor.

*Id*. 397 F.3d at 1224-1225.  The court likened this treatment of "sham" corrections to its treatment

of "sham" affidavits in *Kennedy*.  In other words, in order to accept an alteration or correction of

deposition testimony via a supplemental affidavit, the court must be persuaded that the changes had

a legitimate basis, i.e., the testimony required clarification, the deponent genuinely misunderstood

the question, or the deponent gained access to new evidence containing material facts.  *See*

*Kennedy*, 952 F.2d at 266 (quoting *Miller v. A.H. Robins Co.*, 766 F.2d 1102, 1104 (7th Cir. 1985)).

    Judges in this district have applied this standard to assess the legitimacy of corrected

testimony.  In *B.J.G. v. Society of the Holy Child Jesus*, 2008 WL 896061 (D. Or. Mar. 28, 2008),

plaintiff alleged sexual abuse by nuns more than forty years prior to filing her claim in federal court.

Whether the plaintiff's claims were time-barred was dependent on the time at which she became

aware that she had suffered legally cognizable harm.  The plaintiff submitted a corrected deposition and the defendants moved to strike "plaintiff's amended and 'corrected' answers to her deposition, which alter[ed] plaintiff's testimony regarding when she knew of the impact upon her from the nuns' alleged abuse . . . ." *Id.* at *2.  In her deposition, the plaintiff testified that "she actually knew that what she [said] the sisters did to her had contributed to her bouts of depression long before she finally filed her complaint." *Id.* at *6.  The plaintiff, by way of a corrected deposition, attempted to alter this testimony and assert that she "[did] not know when she became cognizant that the alleged abuse at issue contributed to her depression . . . ." *Id.*  Plaintiff's counsel argued that the corrections were necessary because "plaintiff was pressured for answers that she was unsure of at her deposition and that when pushed, plaintiff was compelled to guess." *Id.*  Judge Haggerty concluded that this allegation was not supported by the record and, therefore, the changes made to the transcript were unjustified.  Accordingly, the motion to strike was granted.

By contrast, in a recent decision also in this district, Judge Papak denied the plaintiffs' motion to strike deposition testimony based on alleged inconsistencies.  The testimony in question dealt with whether the parties were in compliance with an organizational rule.  The court determined that, although the deponent "was less well prepared for his deposition than he would have been under ideal circumstances, and therefore could give no definitive response as to the two plaintiff organizations' current compliance with the Program Integrity Rule, such ill-preparedness [was] not a basis for granting the motion to strike." *Legal Aid Servs. of Oregon v. Legal Servs. Corp.*, 2008 U.S. Dist. LEXIS 28887, at *43 (D. Or. Apr. 7, 2008).  Further, "[b]eyond [the deponent's] inability to answer questions regarding current compliance, comparison of the relevant portions of his deposition testimony and the complained of paragraphs of his declaration reveal[ed] no

contradiction." *Id*. at *44.  Where a court can reasonably reconcile the alleged inconsistencies, a motion to strike should be denied.

In this case, Noga gave a lengthy deposition on January 30, 2008.  After Costco filed its motion for summary judgment, Noga submitted a declaration in which she made assertions both contradictory to and not included in her original deposition.  The declaration differed from the deposition testimony on the following relevant issues:  (1) Harvey referring to himself as "boss man"; (2) persons to whom Noga complained about disparate treatment; (3) the Les Schwab incident; and (4) evidence in support of Noga's retaliation claim.

In her deposition, Noga was asked about the basis of her gender discrimination claim.  Much like the plaintiff in *Hambleton*, Noga's initial answer was very brief and to the point:

> Q:    My question to you is, what facts, what evidence, what circumstances, are
>        you relying on to contend that Costco discriminated against you because
>        of your gender?
>
> A:    I think that males are still promoted a little bit more or faster than women.
>
> Q:    Anything else?
>
> A:    No.

(Noga Depo. 117:7-14.)  In her declaration, however, Noga offered completely different and unrelated information on this point.  She stated that Harvey referred to himself as "boss man" and that she found it "offensive and demeaning" to herself and women in general.  (Noga Decl. ¶ 5.) Accoding to Noga's declaration, "[o]ther employees complained to [her] that they did not like Harvey referring to himself as 'boss man.'  Harvey would generally say that he was 'boss man' when a female employee would question a decision that Harvey had made." (Noga Decl. ¶ 5.) Noga provided no explanation as to why she did not mention this reason or this analysis in her deposition.

Furthermore, it had nothing to do with her original deposition answer, so it is not a clarification of earlier testimony and Noga did not testify in her deposition that Harvey behaved in a sexist manner. In light of these facts, it is not reasonable that Noga would fail to mention the "boss man" comment in her deposition, a comment that would seem central to her claim of gender discrimination and, as she claimed in her declaration, one she deemed both offensive and demeaning. Accordingly, the court will not consider the "boss man" testimony for purposes of this motion.

In her deposition, Noga also stated that she complained to Harvey only about Vermilyer's special treatment and that she did not complain to anyone about Harvey:

> Q:    My question is, did you express some sort of concern about Mr. Harvey or his management style to anyone in the management structure or human resources at Costco?
>
> A:    No. I don't think I did.

(Noga Depo. 102:16-25.)  In her declaration, however, Noga directly contradicted her deposition testimony: "I also complained to Joe Burns and Glen, the two Assistant Managers at that time, about Harvey's preferential treatment of Vermilyer.  I also complained to Curtis, the Wilsonville Warehouse Manager."  (Noga Decl. ¶ 6.)  Again, Noga gives no explanation as to why she now remembers making her complaints to persons in addition to Harvey.  This is an important discrepancy because it bears directly on Noga's retaliation claim, which Noga's deposition testimony fails to support.  Therefore, the court declines to accept, for purposes of this motion, that Noga complained to Curtis or others about Harvey's preferential treatment of a younger coworker.

Noga's testimony about the Les Schwab incident also varies markedly between her deposition and declaration.  Essentially, Noga did not recall the incident during her deposition, but described it at length in her declaration.  (Noga Depo. 98:10-14; Noga Decl. ¶ 3.)  Although this

discrepancy ultimately is unimportant – the parties do not dispute that the incident occurred and that Graber was upset about the incident – it reinforces the court's conclusion that Noga's declaration deviates substantially from her deposition testimony and seems generally intended to help her avoid summary judgment.

Noga testified in her deposition, in support of her age discrimination claim, that Vermilyer said that she, Noga, was old enough to be her mother. (Noga Depo. 117:15-21.) Noga also mentioned that Vermilyer did not always complete her job duties and that she, Noga, complained about it to Harvey, although Noga did not link Vermilyer's alleged acts to her age discrimination claim. (Noga Depo. 91:23-93:2.) In fact, in her deposition, Noga testified that she asked Harvey only why Vermilyer was "going home early if there is nothing left [on the shelves for the next day]." (Noga Depo. 92:18-93:5.) However, Noga never testified that she complained to Harvey that Vermilyer was receiving special treatment, including because of her age, or that Noga was not being permitted the same leeway because of her age. (Noga Depo. 91:5-93:8.) Rather, Noga's sole complaint about Vermilyer was that Vermilyer "wasn't doing her job." (Noga Depo. 91:23-25.)

In her declaration, however, Noga provides more detail about Vermilyer's special treatment and her attitude toward Noga. Specifically, Noga stated that she told Harvey she "did not think it was fair that Vermilyer was being given special treatment." (Noga Decl. ¶ 6.) This statement, and Noga's descriptions of Vermilyer's "attitude" toward her, are offered without explanation and, fairly viewed, are not clarifications of her prior answers in her deposition. Instead, they shift Noga's testimony from complaining about a co-worker not pulling her weight and creating more work for Noga as a result, to the much different subject of Harvey allegedly giving Vermilyer, a younger worker, preferential treatment, but not giving Noga, an older worker, the same privilege, all because

of age.  Therefore, the court will not consider this part of Noga's declaration.

2.    Discrimination Claims:  Disparate Treatment and Retaliation

Plaintiff has alleged unlawful workplace discrimination under two theories:  disparate treatment and retaliation.  The court will address each in turn.

a.    *Disparate Treatment*

As the Supreme Court stated in *Raytheon Co. v. Hernandez*, 540 U.S. 44, 52 (2003), "disparate treatment . . . is the most easily understood type of discrimination.  The employer simply treats some people less favorably than others because of their race, color, religion, sex or other protected characteristic." (quoting *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 335 n.15 (1977) (internal quotation marks omitted)).  Noga alleges that Costco treated her differently than other employees because of her age and gender.  This alleges a claim of disparate treatment, under Title VII, the ADEA, and Oregon law.

"In order to withstand summary judgment on [a] disparate treatment claim, [a] plaintiff may either demonstrate a triable issue based on direct or circumstantial evidence that he was the target of intentional . . . discrimination, or he may make his case under the *McDonnell Douglas* framework." *Courtney v. Oregon Dept. of State Police*, 2008 U.S. Dist. LEXIS 53282, at *30-31 (D. Or. July 11, 2008) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)).  "Direct evidence is 'evidence which, if believed, proves the fact of discriminatory animus without inference or presumption.'" *Vasquez v. County of Los Angeles*, 349 F.3d 634, 640 (9th Cir. Cal. 2003) (quoting *Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1221 (9th Cir. 1998)).

The plaintiff may also rely on the burden-shifting framework set forth in *McDonnell Douglas.  See Knox v. Portland*, 543 F. Supp. 2d 1238, 1246-1247 (D. Or. Mar. 5, 2008) ("For

claims of disparate treatment based on race or gender a plaintiff must first present a prima facie case of discrimination which creates a presumption of discrimination." (citing *Nidds v. Schindler Elevator Corp.*, 113 F.3d 912, 916 (9th Cir. 1996))).   "Under *McDonnell Douglas*, a plaintiff alleging disparate treatment under Title VII must first establish a prima facie case of discrimination. Specifically, the plaintiff must show that (1) he belongs to a protected class; (2) he was qualified for the position; (3) he was subject to an adverse employment action; and (4) similarly situated individuals outside his protected class were treated more favorably." *Chaung v. Univ. of California Davis*, 225 F.3d 1115, 1123 (9th Cir. 2000) (internal citation omitted).

Once a plaintiff has made his prima facie showing of discrimination, "[t]he burden then must shift to the employer to articulate some legitimate, nondiscriminatory reason for the employee's rejection." *McDonnell Douglas*, 411 U.S. at 802.  *See also Knox*, 543 F. Supp. 2d at 1247 ("If plaintiff makes a prima facie case, the burden of production then shifts to the employer to articulate some legitimate, non-discriminatory reason for the adverse employment action." (citing *Chaung v. Univ. of Cal.,* 225 F.3d 1115, 1123-1124 (9th Cir. 2000))).  If the defendant successfully gives such a reason for the employment action, the plaintiff must then demonstrate that the proffered reason is pretextual.  *Chaung*, 225 F.3d at 1124.  Pretext may be established in one of two ways:  "(1) indirectly by showing that defendant's proffered explanation is unworthy of credence because it is internally inconsistent or otherwise not believable; or (2) directly, by showing that unlawful discrimination more likely motivated the defendant." *White v. TA Operating Corp.*, 2008 U.S. Dist. LEXIS 48103, *8-9 (D. Or. June 19, 2008) (citing *Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1220 (9th Cir. 1998)).

The court notes that this Title VII analysis applies equally to claims of age discrimination

under the ADEA. *See Clemons v. Nike, Inc.*, 2007 WL 2890972, *5 (D. Or. Sept. 28, 2007) ("The order and allocation of proof in cases under Title VII of the Civil Rights Act applies to age discrimination claims under the ADEA, which may be proven with direct or circumstantial evidence."). In the Ninth Circuit, this analysis also applies to discrimination claims arising under Oregon law.

> Although Oregon Courts analyzing claims under the Oregon Act have rejected the *McDonnell Douglas* burden-shifting approach, that approach is nevertheless maintained for assessing Oregon employment discrimination claims brought in federal court. 'The standard for establishing a *prima facie* case of discrimination under Oregon law is identical to that used in federal law.'

*Tyson v. Or. Anesthesiology Group, P.C.*, 2008 U.S. Dist. LEXIS 44992, at *16-17 (citing and quoting *Snead v. Metropolitan Property Casualty Insurance Co.*, 237 F.3d 1080, 1090-93, 1087 (9th Cir. 2001), *cert. denied*, 534 U.S. 888 (2001)). Therefore, each of Noga's disparate treatment claims is analyzed under the framework set forth above.

    i.    Direct Evidence

For the proposition that she was a victim of disparate treatment discrimination based on her age and gender, Noga alleges the following direct evidence. First, Noga cites Vermilyer's comment that Noga was old enough to be her mother as evidence of age discrimination. This is not direct evidence of discrimination by an employer. In general, "[s]tray remarks are insufficient to establish discrimination. Stray remarks are remarks unrelated to the decisional process, and are insufficient to demonstrate that the employer relied on illegitimate criteria." *Markey v. Kudelski S.A.*, 2008 WL 65401, at *10 (S.D. Cal. Jan. 3, 2008) (citing *Merrick v. Farmers Ins. Group*, 892 F.2d 1434, 1438 (9th Cir. 1990) and *Smith v. Firestone Tire and Rubber Co.*, 875 F.2d 1325, 1330 (7th Cir. 1989)). Where the statement is not made by a decision-maker, the plaintiff must "establish a nexus between

the alleged discriminatory statement and the decision to terminate." *Selby v. Pepsico, Inc.*, 784 F.

Supp. 750, 757 (N.D. Cal. 1991) (quoting *DeHorney v. Bank of America Nat. Trust and Sav.*, 879

F.2d 459, 468 (9th Cir. 1989)).  Here, the comment was made by a coworker, not Noga's supervisor.

There is no evidence that Vermilyer's comment, made to Noga when she worked at Costco's

Wilsonville warehouse, had any bearing on the decision of Graber, the Bend Warehouse Manager,

not to rehire Noga.  Therefore, the comment is a "stray remark" unrelated to the decision-making

process and not attributable to the employer for purposes of liability under the ADEA.[3]

Second, Noga argues that Harvey treated her differently than another employee, Vermilyer,

by unfairly scrutinizing her work and disciplining her for being four minutes late returning from

lunch.  Again, this is not direct evidence of discrimination.  "Favoritism and unfair treatment, unless

based on a prohibited classification, do not violate Title VII." *Candelore v. Clark County Sanitation

District*, 752 F. Supp. 956, 961 (D. Nev. 1990) (quoting *Miller v. Aluminum Co. of America*, 679

F. Supp. 495, 501 (W.D. Pa.), aff'd without opinion, 856 F.2d 184 (3d. Cir. 1988)).  In *Coleman v.

Quaker Oats Co.*, 232 F.3d 1271 (9th Cir. 2000), two current employees competed for an open

position.  Although the plaintiff had scored one point higher on an evaluation, the other candidate

was chosen.  The defendants gave, as a legitimate non-discriminatory reason for this decision, that

the decision arose from a struggle between the current managers of the two candidates.  The

manager of the candidate ultimately chosen was able to convince the other manager that his

employee should receive the position.  The court wrote: "The 'favoritism' of managers is 'not age

---

[3] Noga also argues that Vermilyer's signature on a personnel document "is evidence that
[Vermilyer] was involved in making decisions regarding Noga's employment." (Pl.'s Resp. Br. 20.)
Costco maintains, however, that "the purpose of a signature is only to show that someone reviewed
the form and verified that the raise was correctly calculated." (Def.'s Reply 10-11.) Noga presented
no contrary evidence.

discrimination.'" *Id.* at 1290 (citing *Shutt v. Sandoz Crop Protection Corp.*, 944 F.2d 1431, 1433 (9th Cir. 1991).

In this district, Judge Stewart addressed the issue of favoritism in *Moore v. Portland Development Commission*, 1999 U.S. Dist. LEXIS 8180 (D. Or. May 17, 2008). The plaintiff argued that a supervisor's favoritism of a white employee was evidence of discrimination against her. Judge Stewart stated that, "at most [the plaintiff] has shown that [her supervisor] may have favored [the other employee], but has not linked this favoritism to race," and that the plaintiff had failed to establish the necessary inference that the favoritism was racially motivated. *Id.* at *19. Here, Noga similarly fails to link Harvey's alleged favoritism of Vermilyer with discriminatory conduct based on age. Noga attempts to associate Vermilyer's comment with Harvey's actions, but there is absolutely no evidence to connect the two. Again, this does not constitute direct evidence of discrimination.

Finally, Noga claims that she was temporarily transferred to a different department as part of a reduction in force, when an employee with less seniority, Cesar Lopez ("Lopez"), should have been transferred instead. As this employee was both younger and male, Noga apparently attributes her transfer to discrimination based on her gender, her age, or both. In her brief, Noga refers to this transfer as a "reduction in force." (Pl.'s Response Memorandum ("Resp. Mem.") 6.) In Costco's Employee Agreement, the "Reduction in Workforce" policy is described as follows: "Should it become necessary to reduce the number of employees in any classification or department, we will attempt to avoid layoffs by giving you the opportunity to perform other work where possible, providing you have the skill, knowledge and ability to perform the job." (Pl.'s Ex. 26 at 2.) There is no mention of seniority in this portion of the Employee Agreement, though it is explicitly defined

in another section, labeled "Seniority," as "the length of time you have been continuously employed by Costco." (Pl.'s Ex. 26 at 3.) The concept is also referred to in the section titled "Non-Seasonal Layoffs" for the proposition that "[l]ayoffs are conducted according to length of continuous employment." (Pl.'s Ex. 26 at 3.)

Taken together, these policies demonstrate that Costco acted in a manner consistent with its policies and refute Noga's claim that her temporary transfer to the front end department was improper and the result of age or gender discrimination. Although Costco's Employee Agreement makes explicit mention and application of seniority, it does not do so with regard to "Reductions in Workforce." Noga offers no other evidence to support this allegation.

In sum, Noga presents no direct evidence of disparate treatment. Accordingly, the court turns to Noga's circumstantial evidence under the *McDonnell Douglas* framework.

ii.    Circumstantial Evidence and *McDonnell Douglas* Analysis

Noga also fails to demonstrate a genuine issue of material fact with respect to her disparate treatment claim under the *McDonnell Douglas* framework. Noga satisfies the test's first two prongs: first, she belonged to a protected class, by virtue of both her age and gender and, second, viewing the facts in the light most favorable to her, she was qualified to work for Costco not only as a cake decorator, but also in the front end or janitorial departments. This is apparent from her employment history and performance reviews.

To satisfy the third prong, Noga must show that she was treated differently than employees not members of her protected class. First, Noga contends that a younger female employee, Vermilyer, was given special privileges that Noga herself did not enjoy. In particular, Noga alleges that Vermilyer was allowed to leave work early without completing all of her job duties and that

Noga would have to complete them instead. However, Noga presented nothing more than a bare allegation that Vermilyer was given special treatment. Noga presented no evidence that this was a result of or related to age discrimination; Noga's only evidence is that Vermilyer was younger than she, from which she concludes she suffered age discrimination. Noga also alleges that Vermilyer made a comment motivated by age discrimination and that Vermilyer may have had some supervisory influence over Noga. The evidence shows that, Vermilyer had no supervisory role or authority over Noga, and Vermilyer's isolated comment referencing Noga's age does not create a reasonable inference that Costco discriminated against her because of her age.

Second, Noga claims that she was a victim of discrimination when Costco failed to rehire her in May 2005. Failure to rehire is considered an adverse employment action when motivated by retaliation, the Supreme Court held, in *Robinson v. Shell Oil Co.*, 519 U.S. 337, 346 (1999). On her application, Noga indicated that she was interested in applying for any available position. (Pl.'s Ex. 20.) Noga asserts that she was qualified to perform various jobs at Costco.

The evidence is unclear as to whether there was an open position at the time Noga applied for rehire. In his declaration, Cabe stated: "At the time she applied, we did not have any positions open for cake decorators in the bakery department, and I told Ms. Noga that. I thought Ms. Noga might be able to work in a cleanup position in the bakery, and that eventually a position as a cake decorator might open up for her." (Cabe Decl. ¶ 3.) Noga testified in her deposition that when she spoke with Cabe about being rehired there was a cake decorator position open, but that it was filled by a current employee, a female in her forties with seniority over Noga. (Cabe Decl. ¶ 7.) Noga also testified that there was also a cleanup position and Cabe told Noga she could have it and that she would probably move up quickly. (Noga Depo. 80:4-15.)

Cabe testified in his deposition that, at the time Noga applied for rehire, there were no positions available in the bakery, but that he expected there to be openings in the future. According to Cabe, he and Noga discussed a current decorator that might retire and another one that might transfer. (Cabe Depo. 33:20-34:16.) He stated that when he spoke with Noga, there was no opening for a cleanup person. (Cabe Depo. 34:23-25.) He later explained that he "anticipated eventually needing a cleanup [person]" but does not remember if he ever actually hired a cleanup person around the time Noga applied for rehire. (Cabe Depo. 58:4-8.) In his deposition, Graber testified that he did not know why someone would be sent for a urinalysis if there were no positions open. (Graber Depo. 37:10-19.)

Viewing this evidence in the light most favorable to Noga, the court concludes that there were open positions for which she was qualified at the time of her reapplication. Therefore, the burden shifts to Costco to proffer a legitimate, nondiscriminatory reason to not rehire Noga.

According to Costco, Graber decided not to rehire Noga for three reasons. First, Graber had a negative opinion of Noga based on the Les Schwab incident. The incident took place when Noga was employed at the Bend Warehouse, prior to her transfer to Wilsonville. According to Graber, "a member, Les Schwab's daughter," came in to pick up a cake previously ordered and it was not ready. Graber testified: "So I went up to the break room to ask her if she could help decorate this cake that we had messed up for the member. And she informed me, no, she could not; she was at lunch. And I got to tell you, that stood out in my mind till this day." (Graber Depo. 21:24-22:3.) Second, Graber based his decision on Curtis's general comments about Noga being disruptive at Wilsonville. When Curtis learned that the Bend location had requested Noga's file, he called Graber. (Graber Depo. 23:22-24:1.) Graber testified that Curtis "wanted to let [him] know that

[Noga] had become rather disruptive in the bakery at Wilsonville." (Graber Depo. 24:3-5.) Curtis said nothing more about Noga and, at this point Graber cut him off because he "wasn't interested in bringing her back as transfer, let alone rehiring her." (Graber Depo. 24:7-13.) Third, Graber did not wish to rehire Noga based on his own general impression that she did not get along with coworkers, that she was bossy, and that she sometimes offended others. At his deposition, Graber stated: "I kind of felt like she, she didn't – I don't know – she kind of didn't get along with everybody in the department or she may be a little bossy at times and offended people." (Graber Depo. 43:17-20.) Each of the reasons stated above related to Noga's interpersonal skills and her performance evaluations at both Bend and Wilsonville corroborate Graber's impressions: Noga's evaluations consistently note that Noga lacked or needed to improve her skills in this area.

Noga now must demonstrate that this was not the reason Costco did not rehire her, but is merely a pretext. Noga can satisfy this burden by "produc[ing] enough evidence to allow a reasonable factfinder to conclude *either*: (a) that the alleged reason for [the adverse employment action] was false, *or* (b) that the true reason for [the adverse employment action] was a discriminatory one." *Nidds v. Schindler Elevator Corp.*, 113 F.3d 912, 918 (9th Cir. 1996) (emphasis in original).

Noga argues that Costco's proffered reason is pretextual, based on the following. First, other than the Les Schwab incident, Graber "had no other direct knowledge of Noga's work performance or ability to interact with coworkers. Graber's information most likely came from Cabe or Curtis." (Pl.'s Resp. Mem. 28.) Graber, however, testified that he had independently formed a negative opinion of Noga, based on the Les Schwab incident and her interpersonal difficulties. Noga has made no evidentiary showing that refutes Graber's independent impression of her. Further, Graber's

impression is corroborated by substantial evidence in the record, including the pattern established in her performance evaluations.

Second, Noga argues that she was not a marginal performer, as demonstrated by her performance evaluations that she claims are uniformly positive. Again, while Noga's evaluations do identify Noga's positive attributes, they also highlight a consistent difficulty with interpersonal relationships. Also, Graber's proffered reason for rejecting Noga's application was not that she was a poor cake decorator, nor does Graber suggest that she could not adequately perform her cake decorating duties. The fact that Noga was successful in certain aspects of her job performance at Costco is not enough to undermine Costco's reason for rejecting her application.

Third, Noga claims that Graber himself was not the sole decision maker; rather, he was influenced by input from Cabe, Curtis, and Harvey. However, there is no evidence to suggest that Cabe, who reported to Graber, had negative information to communicate to Graber about Noga. For one thing, after Noga applied for rehire at the Bend Costco, Cabe sent her out for a drug test, which indicates that Cabe thought Noga would be rehired. This is inconsistent with an intention to dissuade Graber from rehiring Noga. Cabe also wrote a letter of reference for Noga, dated October 22, 2006, which stated, in part, "Christina has a good work ethic and is a very talented person, especially in the decorating station," and "I believe Christina is a motivated employee and somebody that has something to offer any bakery she was to work in." (Pl.'s Ex. 23.) Further, Noga does not claim that Cabe discriminated against her at any time.

As for Harvey, there is no evidence that he communicated directly with Graber regarding Noga's application for rehire. It is possible that Harvey communicated with Curtis, who subsequently communicated with Graber. As Noga points out, a neutral decision-maker can be

influenced by others with discriminatory intent, thus causing the final decision to reflect that discriminatory motive. *Adams v. Home Depot USA, Inc.*, 2007 WL 4565163, at *19 (D. Or. Dec. 19, 2007). However, there is no evidence that Harvey conveyed to Curtis or that Curtis conveyed to Graber any information that could reasonably be viewed as discriminatory. Because Noga has failed to establish that Harvey or Curtis harbored discriminatory animus toward her, or conveyed it to Graber, she also fails to establish that Graber was, or even could have been, tainted by the discriminatory intent of others.

Accordingly, Noga fails to meet her burden to establish that Costco's nondiscriminatory reason not to rehire her was pretextual. Costco's motion for summary judgment on Noga's disparate treatment claim is granted.

b.      *Retaliation*

Noga also alleges that she was retaliated against after voicing complaints that she had been discriminated against based on her age and gender, in violation of Title VII and the ADEA. Chapter 42 of the United States Code, section 2000e-3 states, in relevant part: "It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment . . . because he has opposed any practice made an unlawful employment practice by [Title VII], or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]." 42 USCS § 2000e-3. This provision of Title VII "protects the right to be free from certain types of forbidden discrimination, as well as the right to speak out against such discrimination. It also protects against retaliation for the exercise of the right to speak out against discrimination." *Hernandez v. Spacelabs Medical Inc.*, 343 F.3d 1107, 1113 (9th Cir. 2003).

"A plaintiff may establish a *prima facie* case of discriminatory retaliation by showing that: (1) she engaged in a protected activity; (2) she was subjected to an adverse employment action; and (3) there was a causal link between the protected activity and the adverse employment action." *Jamal v. Wilshire Management Leasing Corp.*, 320 F. Supp. 2d 1060, 1078 (D. Or. June 10, 2004) (citing *Bergene v. Salt River Proejct Agric. Improvement & Power Dist.*, 272 F.3d 1136, 1141 (9th Cir. 2001)). "If the plaintiff establishes a *prima facie* case, 'the *McDonnell Douglas*' order and allocation of proof that governs disparate treatment claims also governs retaliation claims.'" *Kitchen v. WSCO Petroleum Corp.*, 481 F. Supp. 2d 1136, 1144 (D. Or. Jan. 29, 2007) (citing *Yartzoff v. Thomas*, 809 F.2d 1371, 1375 (9th Cir. 1987), *cert. denied* 498 U.S. 939 (1990)).[4]  As above, if Noga can meet her prima facie burden, Costco must proffer a legitimate, nondiscriminatory reason for the adverse employment action.  If Costco can produce such a reason, Noga has the opportunity to rebut that reason on the grounds that it was a mere pretext for the adverse action.

"Informal complaints to a supervisor constitute protected activity in a retaliation claim." *Knox*, 543 F. Supp. 2d at 1248 (citing *Passantino v. Johnson & Johnson Consumer Prods. Inc.*, 212 F.3d 493, 506 (9th Cir. 2000)).  But, a general complaint about a coworker does not amount to a complaint about discrimination.  *See Jamal*, 320 F. Supp. at 1079 ("There can be no inference that [the plaintiff] meant illegal age discrimination when all she ever complained of was that she and anonymous other employees thought Magee was a bad manager.").  Noga alleges that she engaged in protected activity when she complained to Harvey and others about the preferential treatment Vermilyer was receiving.  In her deposition, Noga testified that she complained to Harvey that

_____

[4] Again, this analytical framework governs retaliation claims under Title VII, the ADEA, and ORS 659A.030.

Vermilyer was going home early without completing her job duties. (Noga Depo. 92:8-20.) However, when asked if she expressed any "concern about Mr. Harvey or his management style to anyone in the management structure or human resources at Costco" Noga answered that she did not think so. (Noga Depo. 102:16-21.) She also testified that she did not file a formal complaint with Costco. (Noga Depo. 102:22-25.)

There is, at best, scant evidence that Noga ever complained of discrimination based on age or gender. Noga testified in her deposition that she complained to Harvey about Vermilyer doing a poor job. (Noga Depo. 92:11-13.) Even if the court considered Noga's declaration statement that she "told Harvey that [she] did not think it was fair that Vermilyer was being given special treatment," (Noga Decl. ¶ 6), it is unclear whether Noga complained to Harvey that Vermilyer's special treatment was because of her age.

In her response brief, Noga argues that she was retaliated against because she "engaged in protected activity by complaining to Harvey . . . about how Vermilyer was being given preferential treatment in the Bakery." (Pl.'s Resp. Br. 31.) Even if the court infers that her complaint to Harvey included an allegation of discrimination based on age and, thus, that Noga engaged in protected behavior, Noga cannot meet her burden on this point. Noga must also establish a causal connection between the protected activity and the adverse employment action and she cannot make this connection.

Causation may be "inferred from circumstantial evidence, such as the employer's knowledge that the plaintiff engaged in protected activities and the proximity in time between the protected action and the allegedly retaliatory activity." *Knox*, 543 F. Supp. 2d at 1248 (citing *Yartzoff v. Thomas*, 809 F. 2d 1371, 1376 (9th Cir. 1987)). "Temporal proximity between protected activity

and an adverse employment action can by itself constitute sufficient circumstantial evidence of retaliation in some cases.  However, the timing must be very close."  *Adams*, 2007 WL 4565163, at *26 (internal citations omitted).  It bears noting that "[e]ssential to a causal link is evidence that the employer was aware that the plaintiff had engaged in the protected activity."  *Dameworth v. Linn-Benton Community College*, 2007 WL 2816216, at *6 (D. Or. Sept. 27, 2007) (quoting *Cohen v. Fred Meyer, Inc.*, 686 F.2d 793, 796 (9th Cir. 1982)).

Assuming that, while employed at the Wilsonville Costco, Noga engaged in protected activity when she complained to Harvey about Vermilyer, she still fails to meet her burden to show discrimination.  Some time after she complained about Vermilyer, Noga voluntarily resigned her employment at the Wilsonville Costco in order to take a different job at Williams Bakery, in Eugene. About a month later, she applied for a job at the Bend Costco and was not rehired, a decision made by Graber.  To establish a causal connection, Noga must show that her complaint to Harvey was ultimately communicated to Graber, the person authorized to make all hiring decisions at the Bend Costco, and that this resulted in his refusal to hire her.  Noga contends that Graber learned of her age discrimination complaint when Curtis called Graber regarding her 2005 application for rehire at the Bend Costco.

Harvey stated, in his declaration, that he "expressed [his] concerns with Ms. Noga's poor attitude, her problems working with others and her failure to follow directions to the Warehouse Manager, Roberts Curtis." (Harvey Decl. ¶ 6.)  In his declaration, Curtis stated that when he found out that someone at the Bend Costco had requested Noga's personnel file, he called Graber.  Graber, the Bend Warehouse Manager, was responsible for all final hiring decisions and the only person at the Bend Costco with that authority.  (Graber Decl. ¶ 6.)  "[Curtis] told Mr. Graber that plaintiff had

problems with her coworkers and problems following directions on cake decorating." (Curtis Decl. ¶ 4.) Curtis also claimed that he was "not aware that Ms. Noga ever made any complaints of sex or age discrimination" while at the Wilsonville Costco. When he and Graber spoke, "[they] did not discuss any complaints of sex or age discrimination by Ms. Noga." (Curtis Decl. ¶ 5.)

Graber stated, in his declaration, that Curtis did indeed call him about Noga's application at the Bend Warehouse. According to Graber, "Mr. Curtis told [him] that Ms. Noga was 'disruptive' in that she had problems with coworkers." (Graber Decl. ¶ 7.) Graber "was sure that Mr. Curtis did not mention that Ms. Noga had ever made any complaints of age or sex discrimination at the Wilsonville warehouse." He also stated that "[e]ven before [he] heard Mr. Curtis's comments, [he] was not interested in rehiring Ms. Noga." (Graber Decl. ¶¶ 7-8.) Graber pointed out that he had already denied Noga's transfer request earlier that year, for these reasons. (Graber Decl. ¶ 8.) Graber stated in his deposition: "In early 2005, I received a transfer request from Ms. Noga, who was inquiring into the possibility of returning to Bend. I remembered her as a marginal employee at best, and I was not interested in having her come back, so I denied the transfer request." (Graber Decl. ¶5.) Noga has produced no evidence to refute or call into question Graber's or Curtis's testimony on this point.

Graber's prior denial of Noga's transfer request strongly undermines Noga's retaliation theory. Earlier in 2005, Noga requested a transfer to the Bend Costco and was denied. This took place *prior to* Graber's conversation with Curtis several months later regarding Noga's rehire request, lending credence to Graber's claim that he refused to hire Noga based on his personal knowledge that she was a marginal performer, not because of an alleged complaint of gender or sex discrimination.

Accordingly, Noga has failed to meet her prima facie burden to establish a retaliation claim under Title VII, the ADEA, and ORS 659A.030.   Therefore, Cosctco's motion for summary judgment on these claims should be granted.

3.    IIED

Costco writes, in its Motion for Summary Judgment, that it "moves for summary judgment dismissing plaintiff's claims against Costco alleged in her complaint."  (Def.'s Motion for Summary Judgment 2.)   The court notes that Costco did not brief the IIED claim in its initial summary judgment memorandum and Noga did not address it in her response memorandum.   However, Costco directly addressed the IIED claim in its reply brief.  Noga had opportunity to raise the issue at oral argument, or to request an opportunity to respond in writing, in the form of a sur-reply, but she did neither.  For this reason, the court recognizes the IIED claim as part of Costco's motion and addresses it here.

Under Oregon law, Noga must establish the following, to prove a claim for IIED:  "(1) the defendant intended to inflict severe emotional distress on the plaintiff, (2) the defendant's acts were the cause of the plaintiff's severe emotional distress, and (3) the defendant's acts constituted an extraordinary transgression of the bounds of socially tolerable conduct."  *Sheets v. Knight*, 308 Or. 220, 236 (1989).   Noga fails to establish any of these factors sufficient to survive summary judgment.  There is no evidence to suggest that Costco intended to inflict severe emotional distress on Noga, that Noga suffers from severe emotional distress resulting from her interactions with Costco, or that the bounds of socially tolerable conduct have been transgressed.  Costco's most significant transgression was choosing not to rehire Noga.  Even if this decision had been based on discriminatory animus, which this court holds it was not, "[w]rongfully motivated discharge alone

is insufficient to establish the intolerable conduct element of the IIED tort." *Laird v. Marion County*, 2005 U.S. Dist. LEXIS 36686, at *9 (July 14, 2005) (citing *Madani v. Kendall Ford, Inc.*, 312 Or. 198 (1991)).  Costco's other alleged misdeeds similarly fail to demonstrate the requisite intent.  For these reasons, Costco's motion for summary judgment on Noga's claim for IIED should be granted.

*Conclusion*

For the foregoing reasons, Costco's Motion for Summary Judgment is GRANTED in its entirety.

DATED this 9th day of October, 2008.


                                                            /s/ John V. Acosta
                                                         JOHN V. ACOSTA
                                     United States Magistrate Judge